[L.A. No. 30348. In Bank. Mar. 24, 1975.]

HAYDEN V. WHITE, Plaintiff and Appellant, v.
EDWARD M. DAVIS, as Chief of Police, etc.,
Defendant and Respondent.

758

### COUNSEL

A. L. Wirin, Fred Okrand, John D. O'Loughlin and Jill Jakes for Plaintiff and Appellant.

Burt Pines, City Attorney, John T. Neville, Assistant City Attorney, Robert E. Shannon and Burk M. Wiedner, Deputy City Attorneys, for Defendant and Respondent.

### OPINION

**TOBRINER, J.**—Do the state and federal Constitutions permit police officers, posing as students, to enroll in a major university and engage in the covert practice of recording class discussions, compiling police dossiers and filing "intelligence" reports, so that the police have "records" on the professors and students? Is this "intelligence gathering" by the police covering discussions in university classes and in public and private meetings of university-sponsored organizations, constitutionally valid when such reports "pertain to no illegal activity or acts"? The complaint in the present action challenges this practice of police surveillance as violative of the federal and state constitutional guarantees of freedom of speech, assembly, privacy and due process of law. To this complaint the superior court sustained a demurrer without leave to amend, and thereafter entered judgment in favor of defendant.

We have determined that the superior court erred in sustaining the demurrer; we conclude that the allegations of the complaint state a prima facie violation of freedom of speech and of assembly as well as of the state constitutional right of privacy. As we shall explain, a host of decisions of both the United States Supreme Court and of this court firmly establish the constitutionally enshrined status of freedom of

speech and freedom of association in our nation's universities and colleges. Although the covert surveillance at issue here does not directly prohibit the exercise of protected rights in this realm, it is by now black letter First Amendment law that government activity which even indirectly inhibits the exercise of protected activity may run afoul of the First Amendment proscriptions. Given the delicate nature of academic freedom, we visualize a substantial probability that this alleged covert police surveillance will chill the exercise of First Amendment rights.

In light of this potentially grave threat to freedom of expression, constitutional authorities establish that the government bears the responsibility of demonstrating a compelling state interest which justifies such impingement and of showing that its purposes cannot be achieved by less restrictive means. At this stage of the proceedings, however, defendant has demonstrated no such justification; indeed, because the case arises upon the sustaining of a demurrer, defendant has yet even to file an answer in this litigation. Accordingly, we think that the demurrer should not have been sustained.

Moreover, the surveillance alleged in the complaint also constitutes a prima facie violation of the explicit "right of privacy" recently added to our state Constitution. As we point out, a principal aim of the constitutional provision is to limit the infringement upon personal privacy arising from the government's increasing collection and retention of data relating to all facets of an individual's life. The alleged accumulation in "police dossiers" of information gleaned from classroom discussions or organization meetings presents one clear example of activity which the constitutional amendment envisions as a threat to personal privacy and security. Though the amendment does not purport to invalidate all such information gathering, it does require that the government establish a compelling justification for such conduct. Once again, because the case arises after the sustaining of a demurrer, the government has not yet proffered any justification for the alleged covert information network and police dossiers. Consequently, the demurrer should have been overruled on this basis as well.

Accordingly, we reverse the judgment and remand for a trial on the merits.

1. *The allegations of the complaint.*

Plaintiff Hayden White, a professor of history at the University of

California at Los Angeles and a resident taxpayer of the City of Los Angeles, instituted this taxpayer's suit against defendant Edward M. Davis, Chief of Police of the City of Los Angeles, seeking to enjoin the alleged illegal expenditure of public funds in connection with the police department's conduct of covert intelligence gathering activities at UCLA. The complaint alleges that with the authorization of Chief Davis, members of the Los Angeles Police Department, serving as "secret informers and undercover agents," have registered as students at UCLA, have attended classes held at the university and have submitted reports to the police department of discussions occurring in such classes. The complaint also alleges that the undercover police agents have joined university-recognized organizations, have attended public and private meetings of such organizations and have made reports on discussions at such meetings. The reports of these undercover agents are allegedly maintained by the police department in files, "commonly designated as 'police dossiers'." Finally, the complaint alleges that the reports and dossiers compiled by the police pursuant to these covert surveillance activities "pertain to no illegal activity or acts."

Asserting that the expenditure of public funds for such operation is illegal because such activity "inhibits the exercise of freedom of speech and assembly, and abridges the right of due process of law and of privacy" in violation of the federal and state Constitutions, the complaint sought to enjoin the police department from expending funds for such activities in the future.

Defendant demurred to the complaint, contending that the above allegations failed to state a cause of action in view of past judicial decisions approving the use of undercover agents in police investigations. Defendant also relied heavily on an earlier federal district court decision which had dismissed a similar complaint directed at identical police surveillance operations at UCLA. As we have stated, the superior court sustained the demurrer without leave to amend and thereafter entered judgment in favor of defendant, dismissing the action.

2.     ■ *As a taxpayer, plaintiff has standing under section 526a of the Code of Civil Procedure to seek an injunction against defendant's expenditure of public funds in connection with allegedly illegal police investigatory activities.*

We have noted that this action is brought as a taxpayer's suit under section 526a of the Code of Civil Procedure to enjoin the allegedly illegal

expenditure of public funds.[1] The use of section 526a as a means of challenging the legality of ongoing police investigatory activities has a long and firmly established heritage in this state. In *Wirin* v. *Horrall* (1948) 85 Cal.App.2d 497, 504-505 [193 P.2d 470], for example, a Los Angeles taxpayer instituted an action attacking the constitutionality of a police practice of establishing dragnet "police blockades" at which individuals and automobiles were routinely stopped and searched without a search warrant. In holding that the alleged police conduct violated applicable Fourth Amendment proscriptions, the Court of Appeal explicitly recognized the propriety of enjoining such illegal conduct by means of a taxpayer's suit.

Similarly in *Wirin* v. *Parker* (1957) 48 Cal.2d 890 [313 P.2d 844], our court upheld a taxpayer's challenge to a police department practice of conducting surveillance of private residences by means of concealed microphones without first obtaining a search warrant. Observing that "[i]t is elementary that public officials must themselves obey the law" we held in *Parker* that section 526a provided a general citizen remedy for controlling illegal governmental activity. (*Id.* at p. 894.)

In view of these California precedents, plaintiff's present challenge to the alleged police conduct clearly constitutes a justiciable controversy, requiring this court to determine the constitutional validity of the underlying governmental activity; we do not understand defendant to assert otherwise. In this respect, however, the instant case differs fundamentally from the two federal court decisions, *Laird* v. *Tatum* (1972) 408 U.S. 1 [33 L.Ed.2d 154, 92 S.Ct. 2318] and *Bagley* v. *City of Los Angeles* (C.D.Cal. 1971) (No. 71-166-JWC), upon which defendant places his principal reliance. As we explain, in dismissing complaints challenging governmental surveillance activities, the *Laird* and *Bagley* decisions rested on a restrictive federal doctrine of justiciability which does not apply to taxpayer suits in California.

In *Laird* various individuals, who claimed to be the subjects of an intelligence gathering operation conducted by the United States Army, brought suit to enjoin the governmental activities on the ground that the operation inhibited the exercise of First Amendment rights. The *Laird* court phrased the narrow issue before it as "whether the jurisdiction of a

---

[1]Section 526a provides in relevant part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of . . . funds . . . of a county, town, city or city and county of the state may be maintained against any officer thereof . . . by a citizen resident therein . . . ."

*federal* court may be invoked by a complainant who alleges that the exercise of his First Amendment rights is being chilled by the mere existence, without more, of a governmental investigative and data gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose." (Italics added.) (408 U.S. at p. 10 [33 L.Ed.2d at pp. 161-162].) In *Laird* a five-man majority ruled that such a complaint did not present a justiciable controversy cognizable in federal court. It concluded that an individual must suffer more specific harm than the mere subjection to governmental scrutiny, as the basis for his legal challenge. Because the complaint failed to allege any such specific harm, the *Laird* majority held that it failed to state a federal cause of action.

In *Bagley*—the prior action challenging the police surveillance activities at issue here—the federal district court grounded its decision on the same narrow doctrine of justiciability articulated in *Laird.* Characterizing the plaintiff's "main complaint" as a fear that the police would, in the future, make some unlawful use of the information obtained through undercover agents, the court concluded that "[t]his contention simply does not present any justiciable issue under the Civil Rights Act. . . . 'The mere intention to take some action at some time in the future which might not occur . . . does not present any justiciable question . . . at this time.' "

Thus, in both *Laird* and *Bagley,* the courts held simply that the plaintiffs before them had not suffered the kind of specific harm from the questioned governmental activity which would enable them to challenge the legality of such activity in a federal court. Neither case reaches the question of the constitutionality of the actual intelligence-gathering operation at issue; as the *Laird* court stated in summarizing its holding: "[O]ur conclusion is a narrow one, namely, that on this record the respondents have not presented a case for resolution by the [federal] courts." (408 U.S. at p. 15 [33 L.Ed.2d at p. 164].)

As explained above, the principles of justiciability in taxpayer's suits under section 526a differ fundamentally from the restrictive federal doctrine articulated in *Laird.* ■ Past cases make clear that under section 526a "no showing of special damage to the particular taxpayer [is] necessary" (e.g., *Crowe* v. *Boyle* (1920) 184 Cal. 117, 152 [193 P. 111]); indeed, as we recently stated in *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-268 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206], "[t]he primary purpose of [section 526a] . . . is to 'enable a large body of the

citizenry to challenge governmental action which would otherwise go unchallenged in the courts because of the standing requirement.' [Citation.]'"

Thus, we must proceed to the merits of this case and determine whether the allegations of the complaint state a prima facie case of illegal governmental activity.

3.  ▆▆▆  *Because of the potentially substantial inhibition of free expression and association posed by the police department's alleged covert surveillance of university classes and organization meetings, such conduct presumptively violates our state and federal Constitutions.*

At the outset we note that for purposes of the present appeal, defendant's demurrer admits the truthfulness of the properly pleaded factual allegations of the complaint. (See, e.g., *Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) Accordingly, we must assume that the Los Angeles Police Department is conducting a regular, ongoing covert surveillance operation of university classes and university-recognized organizations, and is compiling police dossiers on "matters which pertain to no illegal activity or acts." The present pleadings do not indicate any limits on the scope or extent of these undercover activities.

In support of the trial court's ruling that these facts, even if true, do not demonstrate illegal governmental behavior, defendant argues that the undercover activities at issue here are no different than the "normal" undercover police operations which the courts have regularly sanctioned. In this connection, defendant relies heavily on the statement of the United States Supreme Court in *Lewis* v. *United States* (1966) 385 U.S. 206, 209 [17 L.Ed.2d 312, 315, 87 S.Ct. 424], declaring that "in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." The undercover police activity at issue in *Lewis*—involving the investigation of *specific criminal activity* by an undercover narcotics agent—is, however, a far cry from the police surveillance network at issue in this case. Moreover, even within the realm of the investigation of specific crimes, the *Lewis* court did not grant blanket approval to all covert operations, emphasizing that "in this area, each case must be judged on its own particular facts." (385 U.S. at p. 212 [17 L.Ed.2d at p. 316].)

The gist of defendant's position, as we understand it, is that the

gathering of intelligence information to enable the police to anticipate and perhaps prevent future criminal activity is a legitimate and important police function and consequently that under all circumstances the police may routinely utilize undercover agents to fulfill such a function. Although the police unquestionably pursue a legitimate interest in gathering information to forestall future criminal acts, the identification of that legitimate interest is just the beginning point of analysis in this case, not, as defendant suggests, the conclusion. ■ The inherent legitimacy of the police "intelligence gathering" function does not grant the police the unbridled power to pursue that function by any and all means. In this realm, as in all others, the permissible limits of governmental action are circumscribed by the federal Bill of Rights and the comparable protections of our state Constitution.[2]

The most familiar limitations on police investigatory and surveillance activities, of course, find embodiment in the Fourth Amendment of the federal Constitution and article I, section 13 (formerly art. I, § 19) of the California Constitution. On numerous occasions in the past, these provisions have been applied to preclude specific ongoing police investigatory practices. Thus, for example, the court in *Wirin* v. *Parker, supra,* 48 Cal.2d 890, prohibited the police practice of conducting warrantless surveillance of private residences by means of concealed microphones. And, in a series of cases culminating in the recent opinion in *People* v. *Triggs* (1973) 8 Cal.3d 884 [106 Cal.Rptr. 408, 506 P.2d 232], our court has invalidated covert police investigation involving routine and continual surveillance of public restrooms. (See *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288]; *Britt* v. *Superior Court* (1962) 58 Cal.2d 469 [24 Cal.Rptr. 849, 374 P.2d 817].) Indeed, in *United States* v. *United States District Court* (1972) 407 U.S. 297 [32 L.Ed.2d 752, 92 S.Ct. 2125], the United States Supreme Court recently rejected a contention—somewhat analogous to that proposed in the instant case—that governmental intelligence operations in "domestic security" cases were immune from Fourth Amendment proscriptions, holding that the traditional constitutional guarantees could not be disregarded.

---

[2]As Professor Westin has recently noted: "[O]ne of the central elements of the history of liberty in Western societies since the days of the Greek city-state has been the struggle to install limits on the powers of economic, political and religious authorities to place individuals and private groups under surveillance against their will. The whole network of American constitutional rights . . . was established to curtail the ancient surveillance claims of governmental authorities." (Westin, Privacy and Freedom (1967) p. 57.)

Unlike these past cases involving the limits on police surveillance prescribed by the constitutional "search and seizure" provisions, the instant case presents the more unusual question of the limits placed upon police investigatory activities by the guarantees of freedom of speech. (U.S. Const., 1st & 14th Amends.; Cal. Const., art. I, § 2.)[3] As discussed below, this issue is not entirely novel; to our knowledge, however, the present case represents the first instance in which a court has confronted the issue in relation to ongoing police surveillance of a *university community.*

■ Our analysis of the limits imposed by the First Amendment upon police surveillance activities must begin with the recognition that with respect to First Amendment freedoms "the Constitution's protection is not limited to direct interference with fundamental rights." (*Healy* v. *James* (1972) 408 U.S. 169, 183 [33 L.Ed.2d 266, 280, 92 S.Ct. 2338].) Thus, although police surveillance of university classrooms and organization meetings may not constitute a direct prohibition of speech or association, such surveillance may still run afoul of the constitutional guarantee if the effect of such activity is to chill constitutionally protected activity. "In the domain of these indispensable liberties, whether of speech, press, or association, the decisions of this Court recognize that abridgement of such rights, even though unintended, may inevitably follow from varied forms of governmental action." (*N.A.A.C.P.* v. *Alabama* (1958) 357 U.S. 449, 461 [2 L.Ed.2d 1488, 1499, 78 S.Ct. 1163].) As the United States Supreme Court stated recently in *Healy* v. *James, supra,* 408 U.S. 169, 183 [33 L.Ed.2d 266, 280-281]: "We are not free to disregard the practical realities. Mr. Justice Stewart has made the salient point: 'Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference.' [Citation.]"

As a practical matter, the presence in a university classroom of undercover officers taking notes to be preserved in police dossiers must inevitably inhibit the exercise of free speech both by professors and students. ■ In a line of cases stretching over the past two decades,

[3] Our present decision is grounded in both the federal and state Constitutions. Although recent decisions of this court have established that comparable federal and state constitutional provisions are not necessarily co-extensive (see, e.g., *People* v. *Krivda* (1973) 8 Cal.3d 623, 624 [105 Cal.Rptr. 521, 504 P.2d 457]; *Rios* v. *Cozens* (1973) 9 Cal.3d 454, 455 [107 Cal.Rptr. 784, 509 P.2d 696]), we need not explore potential variances in application here for we believe the same conclusion is mandated by each fundamental document. For convenience, this opinion utilizes the term "First Amendment" and "First Amendment rights" to refer to the relevant freedom of speech guarantees of both the federal and state Constitutions.

the United States Supreme Court has repeatedly recognized that to compel an individual to disclose his political ideas or affiliations to the government is to deter the exercise of First Amendment rights. Thus, for example, in *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 462 [2 L.Ed.2d 1488, 1499-1500], the Supreme Court struck down a court order requiring the NAACP to disclose its membership lists, declaring: "It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute [an] effective . . . restraint on freedom of association . . . . Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." And in *Talley* v. *California* (1960) 362 U.S. 60, 64 [4 L.Ed.2d 559, 563, 80 S.Ct. 536], the court invalidated a city ordinance requiring all handbills to include the names and addresses of the persons who had prepared the material, finding that "[t]here can be no doubt that such an identification requirement would tend to restrict freedom to distribute information and thereby freedom of expression." (See also *Lamont* v. *Postmaster General* (1965) 381 U.S. 301, 307 [14 L.Ed.2d 398, 402, 85 S.Ct. 1493].)[4]

In like manner, covert police surveillance and intelligence gathering may potentially impose a significant inhibiting effect on the free expression of ideas. As the United States Supreme Court only recently observed: "Official surveillance, whether its purpose be criminal investigation or ongoing intelligence gathering, risks infringement of constitutionally protected privacy of speech." (*United States* v. *United States District Court, supra,* 407 U.S. 297, 320 [32 L.Ed.2d 752, 768].)

The threat to First Amendment freedoms posed by any covert intelligence gathering network is considerably exacerbated when, as in the instant case, the police surveillance activities focus upon university classrooms and their environs. As the United States Supreme Court has

---

[4]Although defendant contends that the "semi-public" nature of a university classroom negates any claim of "First Amendment privacy," the controlling Supreme Court rulings refute this assertion. For example, in both *N.A.A.C.P.* and *Talley,* the fact that the private individuals involved had revealed their associations or beliefs to many people was not viewed by the court as curtailing their basic interest in preventing *the government* from prying into such matters. Although if either a teacher or student speaks in class he takes the "risk" that another class member will take note of the statement and perhaps recall it in the future, such a risk is qualitatively different than that posed by a governmental surveillance system involving the filing of reports in permanent police records. The greatly increased "chilling effect" resulting from the latter *governmental* activity brings constitutional considerations into play. (See Note, *Developments in the Law—Academic Freedom* (1968) 81 Harv.L.Rev. 1045, 1073-1074.)

recognized time and again: "The vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." (*Shelton* v. *Tucker* (1960) 364 U.S. 479, 487 [5 L.Ed.2d 231, 236, 81 S.Ct. 247].) "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers [and students] concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. . . . The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection' [Citation.]" (*Keyishian* v. *Board of Regents* (1967) 385 U.S. 589, 603 [17 L.Ed.2d 629, 640, 87 S.Ct. 675].)

In the past, threats to academic freedom have generally arisen from governmental conduct involving significantly less intrusion into the academic community than posed by the police activities at issue in the instant case. Thus, prior cases have most frequently involved either state statutes inquiring into teacher's organizational associations (see, e.g., *Shelton* v. *Tucker, supra,* 364 U.S. 479) or provisions requiring teachers to sign overly broad loyalty oaths. (See, e.g., *Wieman* v. *Updegraff* (1952) 344 U.S. 183 [97 L.Ed. 216, 73 S.Ct. 215]; *Baggett* v. *Bullitt* (1964) 377 U.S. 360 [12 L.Ed.2d 377, 84 S.Ct. 1316]; *Monroe* v. *Trustees of the California State Colleges* (1971) 6 Cal.3d 399 [99 Cal.Rptr. 129, 491 P.2d 1105].) Our research reveals only one previous instance, *Sweezy* v. *New Hampshire* (1957) 354 U.S. 234 [1 L.Ed.2d 1311, 77 S.Ct. 1203], in which governmental inquiry sought to reach inside the classroom itself; the Supreme Court's stinging condemnation of that intrusive investigative effort illuminates the constitutional issues presented by the instant case.

In *Sweezy* a state attorney general, in the course of a far-reaching investigation into subversive activities, asked Sweezy, a college professor, several questions about the contents of a guest lecture Sweezy had delivered to a class at the University of New Hampshire.[5] Sweezy

---

[5]The attorney general asked Professor Sweezy the following questions: "What was the subject of your lecture?" "Didn't you tell the class at the University of New Hampshire on Monday, March 22, 1954, that Socialism was inevitable in this country?" "Did you advocate Marxism at that time?" "Did you express the opinion, or did you make the statement at that time that Socialism was inevitable in America?" "Did you in this last lecture on March 22 or in any of the former lectures espouse the theory of dialectical materialism?" (354 U.S. at pp. 243-244 [1 L.Ed.2d at p. 1321].)

refused to answer any questions about the lecture on the ground that such inquiries violated his First Amendment rights, but a state court held the professor in contempt. On appeal, the United States Supreme Court reversed the contempt order, and, in two separate opinions, emphasized in strong language the grave dangers presented by governmental intrusion into the contents of classroom discussion.

Chief Justice Warren, writing for four justices, declared: "The essentiality of freedom in the community of American universities is almost self-evident. . . . To impose any strait jacket upon the intellectual leaders in our colleges and universities would imperil the future of our Nation. . . . Scholarship cannot flourish in an atmosphere of suspicion and distrust." (354 U.S. at p. 250 [1 L.Ed.2d at pp. 1324-1325].) Justice Frankfurter, in a concurrence joined by Justice Harlan, was even more emphatic: "These pages need not be burdened with proof . . . of the dependence of a free society on free universities. *This means the exclusion of governmental intervention in the intellectual life of a university. It matters little whether such intervention occurs avowedly or through action that inevitably tends to check the ardor and fearlessness of scholars, qualities at once so fragile and so indispensable for fruitful academic labor.* . . . [I]n these matters of the spirit inroads on legitimacy must be resisted at their incipiency." (Italics added.) (354 U.S. at pp. 262-263 [1 L.Ed.2d at pp. 1331-1332].)

The police investigatory conduct at issue unquestionably poses at least as debilitating a threat to academic freedom as that presented by the governmental inquiry in *Sweezy.* According to the allegations of the complaint, which for purposes of this appeal must be accepted as true, the Los Angeles Police Department has established a network of undercover agents which keeps regular check on discussions occurring in various university classes. Because the identity of such police officers is unknown, no professor or student can be confident that whatever opinion he may express in class will not find its way into a police file. If the after-the-fact inquiry conducted in *Sweezy* threatened to cast a pall of orthodoxy over classroom debates, the covert presence of governmental agents within the classroom itself must cast a deeper shadow.

The crucible of new thought is the university classroom; the campus is the sacred ground of free discussion. Once we expose the teacher or the student to possible future prosecution for the ideas he may express, we forfeit the security that nourishes change and advancement. The censorship of totalitarian regimes that so often condemns developments in art, science and politics is but a step removed from the inchoate

surveillance of free discussion in the university; such intrusion stifles creativity and to a large degree shackles democracy.

In other contexts, a number of courts have issued injunctions against continued police surveillance in cases in which such conduct imposed a similar chilling effect on First Amendment rights. In *Local 309* v. *Gates* (N.D.Ind. 1948) 75 F.Supp. 620, strike activity by a local union had been accompanied by occasional outbreaks of violence. The state police initiated a practice of sending several uniformed policemen to all union meetings to take notes of the discussions that there occurred; the police justified the practice as an attempt to obtain information relating to future incidents of violence. The union sought an injunction against the police surveillance practice on First Amendment grounds. After a full hearing, the trial court granted the injunction, finding first that the presence of the police had in fact kept the union members from fully discussing their affairs, and second that the surveillance could not be justified as necessary to prevent violence because no evidence indicated that the union meetings had any connection with the sporadic incidents of violence.

In *Bee See Books Inc.* v. *Leary* (S.D.N.Y. 1968) 291 F.Supp. 622, another federal court reached a similar conclusion in a different setting. In *Bee See,* the New York City Police Department had begun stationing uniformed police officers in "adult bookstores" to oversee the bookstore's operations and to detect sales of obscene material. Finding that the practical effect of the constant police surveillance substantially inhibited the sale of protected material, the court in *Bee See* enjoined the surveillance operations, concluding that the government could achieve the legitimate objective of controlling obscenity through alternative means less destructive of First Amendment rights.

The First Amendment analysis undertaken by the courts in *Gates* and *Bee See* accords with the approach established by controlling United States Supreme Court precedent. Having found that the governmental activity in question (police surveillance) had a substantial inhibitory effect on the exercise of First Amendment rights, both courts carefully analyzed the proffered governmental explanation for the surveillance to determine whether it was sufficient to justify the resulting impingement on protected expression.[6]

---

[6]In *United States* v. *McLeod* (5th Cir. 1967) 385 F.2d 734, 750, the Fifth Circuit took a similar approach and found police surveillance of several public mass meetings to be justified because of the potential danger to the public peace, a situation negated by the

■ As we have discussed above, the facts alleged in the instant complaint demonstrate police surveillance activity which is likely to pose a substantial restraint upon the exercise of First Amendment rights in university classes and organization meetings. In view of this significant potential chilling effect, the challenged surveillance activities can only be sustained if defendant can demonstrate a "compelling" state interest which justifies the resultant deterrence of First Amendment rights and which cannot be served by alternative means less intrusive on fundamental rights. (See, e.g., *United States* v. *O'Brien* (1968) 391 U.S. 367, 376-377 [20 L.Ed.2d 672, 679-680, 88 S.Ct. 1673]; *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 463 [2 L.Ed.2d 1488, 1500]; *Shelton* v. *Tucker, supra,* 364 U.S. 479, 488 [5 L.Ed.2d 231, 237]; cf. *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 506-508 [55 Cal.Rptr. 401, 421 P.2d 409].)[7]

In the instant case, defendant's burden of justification is very heavy indeed. Not only does the alleged covert intrusion into university classes

---

allegations of the instant complaint. In *McLeod,* civil rights advocates contended that the stationing of numerous police officers at a number of voter registration rallies in Selma, Alabama had impermissibly chilled First Amendment rights. Although explicitly recognizing "that surveillance of meetings may tend to deter the exercise of federally guaranteed rights," the court concluded that "[i]n the explosive situation prevailing in Selma in 1963, it would have been a dereliction of duty for the county not to have provided law enforcement coverage of these mass meetings." (385 F.2d at p. 750.)

In *Anderson* v. *Sills* (1970) 56 N.J. 210 [265 A.2d 678], the New Jersey Supreme Court reversed a lower court decision which had granted summary judgment to individuals seeking to restrain the implementation of a state-wide intelligence gathering apparatus, and remanded for a trial on the merits. Although defendant suggests that *Anderson* supports the trial court decision in this case, the cases are clearly distinguishable on several grounds. First, as just noted, the court in *Anderson* did not affirm a decision sustaining a demurrer, but rather held that a full trial on the merits was needed, a conclusion which supports our present holding. Second, the intelligence gathering operation at issue in *Anderson* did not involve covert intrusion into academic classrooms but rather attendance at public mass meetings and demonstrations. Moreover, although the *Anderson* court does suggest at one point that courts should decline to interfere with police information gathering absent a showing of "bad faith" (265 A.2d at p. 688), the controlling United States Supreme Court decisions establish that when governmental action significantly inhibits First Amendment activity, *whether intentionally or inadvertently,* a compelling justification for such inhibition must be demonstrated. (See, e.g., *N.A.A.C.P.* v. *Alabama, supra,* 357 U.S. 449, 461.)

[7]As the United States Supreme Court stated in *Gibson* v. *Florida Legislative Comm.* (1963) 372 U.S. 539, 545 [9 L.Ed.2d 929, 935, 83 S.Ct. 889]: "[The] power to investigate, broad as it may be, is not without limit. . . . When . . . the claim is made that particular [governmental] inquiries . . . infringe substantially upon First and Fourteenth Amendment . . . rights of individuals, the courts are called upon to, and must, determine the permissibility of the challenged actions [citation]; '[T]he delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights.' [Citation.]"

and meetings pose a grave threat to the freedom of expression necessary for the preservation of the university as we know it today, but the complaint also alleges that the information gathered by the undercover police officers "pertains to no illegal activity or acts." Because this case arises upon the sustaining of a demurrer, defendant has as yet given no explanation or justification for the alleged surveillance; indeed, defendant has yet to file any answer at all in this case. Thus, inasmuch as we have determined that the complaint does demonstrate a prima facie violation of First Amendment rights, the trial court erred in sustaining defendant's demurrer. The judgment must accordingly be reversed and the case remanded for a trial on the merits.

4. *The alleged police surveillance and data gathering activities constitute a prima facie violation of the recently enacted state constitutional right of privacy.*

The complaint in the instant case asserts that in addition to infringing the constitutional freedoms of speech and association, the conduct challenged here abridges students' and teachers' constitutional "right of privacy." ■ ■■■■ Shortly after the court sustained the demurrer to the complaint, the people of California amended the state Constitution to provide explicit protection to every individual's interest in "privacy." Although the full contours of the new constitutional provision have as yet not even tentatively been sketched, we have concluded that the surveillance and data gathering activities challenged in this case do fall within the aegis of that provision.[8]

In November 1972, the voters of California specifically amended article I, section 1 of our state Constitution to include among the various "inalienable" rights of "all people" the right of "privacy."[9] Although the

[8]Although the voters did not adopt the new constitutional provision until after the filing of the instant suit and the sustaining of the demurrer, the new constitutional provision is controlling on this appeal because the complaint sought only injunctive relief to restrain the continuation of the alleged surveillance and data collecting practice in the future. "Relief by injunction operates in futuro, and the right to it must be determined as of the date of decision by an appellate court." (*American Fruit Growers* v. *Parker* (1943) 22 Cal.2d 513, 515 [140 P.2d 23]; see, e.g., *Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492, 496-497 [254 P.2d 497]; *United States* v. *Alabama* (1960) 362 U.S. 602, 604 [4 L.Ed.2d 982, 983, 80 S.Ct. 924]; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 222, p. 4212.)

[9]Article I, section 1 (as reworded by constitutional amendment in November 1974) now reads: "All people are by nature free and independent, and have certain inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

general concept of privacy relates, of course, to an enormously broad and diverse field of personal action and belief,[10] the moving force behind the new constitutional provision was a more focussed privacy concern, relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society. The new provision's primary purpose is to afford individuals some measure of protection against this most modern threat to personal privacy.

The principal objectives of the newly adopted provision are set out in a statement drafted by the proponents of the provision and included in the state's election brochure. The statement begins: "The proliferation of government snooping and data collecting is threatening to destroy our traditional freedoms. Government agencies seem to be competing to compile the most extensive sets of dossiers of American citizens. Computerization of records makes it possible to create "cradle-to-grave" profiles of every American. [¶] *At present there are no effective restraints on the information activities of government and business. This amendment creates a legal and enforceable right of privacy for every Californian.*" (Italics in original.)

The argument in favor of the amendment then continues: "The right of privacy is the right to be left alone. It is a fundamental and compelling interest. It protects our homes, our families, our thoughts, our emotions, our expressions, our personalities, our freedom of communion and our freedom to associate with the people we choose. It prevents government and business interests from collecting and stockpiling unnecessary information about us and from misusing information gathered for one purpose in order to serve other purposes or to embarass us.

"*Fundamental to our privacy is the ability to control circulation of personal information.* [Italics in original.] This is essential to social relationships and personal freedom. The proliferation of government and business records over which we have no control limits our ability to control our personal lives. Often we do not know that these records even exist and we are certainly unable to determine who has access to them.

---

[10]The breadth of the concept of privacy is illustrated by the wide variety of contexts in which the constitutional privacy analysis has been employed. (See, e.g., *Griswold* v. *Connecticut* (1965) 381 U.S. 479 [14 L.Ed.2d 510, 85 S.Ct. 1678] (privacy of marital relationship); *Stanley* v. *Georgia* (1969) 394 U.S. 557, 564, 565 [22 L.Ed.2d 542, 549, 550, 89 S.Ct. 1243] (privacy of one's personal library); *City of Carmel-By-The-Sea* v. *Young* (1970) 2 Cal.3d 259, 266-268 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313] (privacy of personal financial affairs); *In re Lifschutz* (1970) 2 Cal.3d 415, 431-432 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1] (privacy of psychotherapist-patient relationship).)

"Even more dangerous is the loss of control over the accuracy of government and business records of individuals. Obviously if the person is unaware of the record, he or she cannot review the file and correct inevitable mistakes. . . . [¶] The average citizen . . . does not have control over what information is collected about him. Much is secretly collected. . . ."

The argument concludes: "The right of privacy is an important American heritage and essential to the fundamental rights guaranteed by the First, Third, Fourth, Fifth and Ninth Amendments to the U.S. Constitution. This right should be abridged only when there is a compelling public need. . . ."

■ ■■■ Several important points emerge from this election brochure "argument," a statement which represents, in essence, the only "legislative history" of the constitutional amendment available to us.[11] First, the statement identifies the principal "mischiefs" at which the amendment is directed: (1) "government snooping" and the secret gathering of personal information; (2) the overbroad collection and retention of unnecessary personal information by government and business interests; (3) the improper use of information properly obtained for a specific purpose, for example, the use of it for another purpose or the disclosure of it to some third party; and (4) the lack of a reasonable check on the accuracy of existing records. Second, the statement makes clear that the amendment does not purport to prohibit all incursion into individual privacy but rather that any such intervention must be justified by a compelling interest. Third, the statement indicates that the amendment is intended to be self-executing, i.e., that the constitutional provision, in itself, "creates a legal and enforceable right of privacy for every Californian."

In several respects, the police surveillance operation challenged in the instant complaint epitomizes the kind of governmental conduct which the new constitutional amendment condemns. In the first place, the routine stationing of covert, undercover police agents in university classrooms and association meetings, both public and *private*, constitutes

---

[11]California decisions have long recognized the propriety of resorting to such election brochure arguments as an aid in construing legislative measures and constitutional amendments adopted pursuant to a vote of the people. (See, e.g., *Carter v. Com. on Qualifications, etc.* (1939) 14 Cal.2d 179, 185 [93 P.2d 140]; *Beneficial Loan Society, Ltd. v. Haight* (1932) 215 Cal. 506, 515 [11 P.2d 857]; *Story v. Richardson* (1921) 186 Cal. 162, 165-166 [198 P. 1057, 18 A.L.R. 750]; *In re Quinn* (1973) 35 Cal.App.3d 473, 483-486 [110 Cal.Rptr. 881].)

"government snooping" in the extreme. Second, as noted above, the instant complaint alleges that the information gathered by the undercover agents from class discussion and organization meetings "pertains to no illegal activity or acts"; if this allegation is true, and we must assume it is at this stage of the proceedings, a strong suspicion is raised that the gathered material, preserved in "police dossiers," may be largely unnecessary for any legitimate, let alone "compelling," governmental interest.

In view of these considerations, we believe that the allegations of the present complaint state a prima facie violation of the state constitutional right of privacy. At trial, of course, defendant will be free to contest any of the allegations of the complaint as well as to designate the compelling governmental interests upon which they rely for their intrusive conduct. (See *County of Nevada* v. *MacMillen* (1974) 11 Cal.3d 662, 670-672 [114 Cal.Rptr. 345, 522 P.2d 1345]; *City of Carmel-By-The-Sea* v. *Young, supra,* 2 Cal.3d 259, 268; *Griswold* v. *Connecticut, supra,* 381 U.S. 479, 497 [14 L.Ed.2d 510, 522].) We intimate no opinion as to the resolution of the ultimate constitutional question after trial. We hold only that the demurrer to the complaint was improperly sustained.

5. *Conclusion.*

As far as we are aware, the extensive, routine, covert police surveillance of university classes and organization meetings alleged by the instant complaint are unprecedented in our nation's history. The dangers implicit in such police operations, however, have long been understood.

The English historian, Sir Thomas Erskine May, writing in the middle of the 19th century, observed: "Next in importance to personal freedom is immunity from suspicions and jealous observation. Men may be without restraints upon their liberty; they may pass to and fro at pleasure: but if their steps are tracked by spies and informers, their words noted down for crimination, their associates watched as conspirators,—who shall say that they are free? Nothing is more revolting . . . than the espionage which forms part of the administrative system of continental despotisms. It haunts men like an evil genius, chills their gayety, restrains their wit, casts a shadow over their friendships, and blights their domestic hearth. The freedom of a country may be measured by its immunity from this baleful agency." (2 May, Constitutional History of England (1863) p. 275.)

The motto of one of our great universities—Stanford University—is "The wind of freedom blows," but the air of its classrooms would be befouled indeed by the presence of secret police. In the course of classroom debate some thoughts will be hazarded only as the trial balloons of new theories. Yet such propositions, that are tentative only, will nevertheless be recorded by police officers, filtered through the minds of the listening informers, often incorrectly misstated to their superiors and sometimes maliciously distended. Only a brave soul would dare to express anything other than orthodoxy under such circumstances. But the classroom of the university should be a forum of free expression; its very function would largely be destroyed by the practices described in the complaint before us.

The judgment is reversed.

Wright, C. J., McComb, J., Mosk, J., Sullivan, J., Clark, J., and Burke, J.,* concurred.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.