[Civ. No. 21801. Third Dist. Apr. 16, 1985.]

WILLIAM O. WOOD, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
BOARD OF MEDICAL QUALITY ASSURANCE, Real Party in Interest.

[Civ. No. 22053. Third Dist. April 16, 1985.]

WILLIAM LINN, Petitioner, v.
THE SUPERIOR COURT OF SACRAMENTO COUNTY, Respondent;
BOARD OF MEDICAL QUALITY ASSURANCE, Real Party in Interest.

**COUNSEL**

Robert J. Sullivan, Mary A. O'Gara, Bealisa S. Naegele, Turner & Sullivan and Thomas W. Martin, Jr., for Petitioners.

No appearance for Respondent.

John K. Van de Kamp and George Deukmejian, Attorney Generals, Robert C. Cross and Steven M. Kahn, Deputy Attorneys General, for Real Party in Interest.

**OPINION**

**BLEASE, Acting P. J.**—In this consolidated proceeding we consider the authority of the Board of Medical Quality Assurance (Bus. & Prof. Code, § 2001) to subpoena the medical records of a physician's patients without their consent. The board, in the course of investigations of Drs. Wood and Linn (petitioners), issued administrative subpoenas (Gov. Code, § 11181) requiring them to produce the complete medical records of named patients. Each refused to comply and the board sought judicial enforcement of the subpoenas. (Gov. Code, § 11187.) The trial court upheld the board and ordered compliance with the subpoenas. Each doctor petitioned this court for a writ of mandate overturning the orders. Although the orders requiring compliance with the subpoenas are appealable as final judgments in special proceedings (*Franchise Tax Board* v. *Barnhart* (1980) 105 Cal.App.3d 274, 277 [164 Cal.Rptr. 331]), we have issued alternative writs which are conclusive of petitioners' entitlement to extraordinary relief. We will grant the

relief requested on the ground that the board has not shown sufficient cause for the judicial enforcement of its subpoenas.

*Facts*

The board is charged with the duty of investigating claims of unprofessional conduct. (Bus. & Prof. Code, § 2220.) It conducts routine audits of pharmacy records of prescriptions for schedule II controlled substances.[1] (Bus. & Prof. Code, § 4331.) The audits of prescriptions written by petitioners made board investigators suspicious of the propriety of their issuance. Health and Safety Code section 11210 provides that a physician may only prescribe controlled substances with a good faith belief that it is a required treatment for a patient's ailment and only in a quantity and for a time that is reasonably necessary. A violation of this provision is unprofessional conduct (Bus. & Prof. Code, § 2238, former § 2391.5 [Stats. 1947, ch. 309, p. 867, § 1]) and subjects the violator to disciplinary action by the board (Bus. & Prof. Code, § 2234, former § 2361 [Stats. 1937, ch. 414, p. 1377]). The board issued administrative subpoenas for "the complete medical records pertaining to" 16 of Wood's patients and 36 of Linn's patients who had been prescribed schedule II drugs in circumstances deemed suspicious by board personnel. The ground of these suspicions is set forth in the affidavits tendered in support of the respective subpoenas.

*The Wood Subpoena*

The declaration of Lynn Sullivan, an investigator for the board, alleges she was "conducting a routine pharmacy audit at Galt Pharmacy" in June 1981, when a pharmacist referred her to "numerous prescriptions for large quantities of Demerol written by" Dr. Wood for a patient. The pharmacist told Sullivan "he believed [the patient] is receiving excessive doses of Demerol." Sullivan then obtained copies from the Department of Justice of all Schedule II controlled substance prescriptions written by Wood from April 1980, through March 1981. In her opinion a review of these prescriptions showed Wood was prescribing larger quantities of these drugs and for

---

[1]The prescription of certain drugs with potential for dangerous abuse is regulated by state and federal statutes. (See 21 U.S.C. § 801 et seq; Health & Saf. Code, § 11150 et seq.) Some of these drugs are designated as schedule II controlled substances. (Health & Saf. Code, § 11055.) Schedule II drugs must be prescribed on triplicate forms issued by the Department of Justice in serially numbered groups. (Health & Saf. Code, §§ 11161, 11164.) The pharmacist retains the original of the prescription and must transmit one copy to the Department of Justice. (Health & Saf. Code, § 11164.) Presumably the board is entitled to receive these pursuant to Civil Code section 1798.24, subdivision (e). The prescriber must make an additional record of the name and address of the patient, the date, the character and quantity of the drug and the pathology and purpose for which the drug is prescribed. (Health & Saf. Code, § 11190.)

longer periods than usual for a general practitioner in the community. Sullivan went to various additional pharmacies to collect information on Wood's prescription practices. She compiled information on 16 patients for whom Wood had prescribed schedule II controlled substances. Her declaration lists each patient, the drugs prescribed, and the duration of the prescription. In most instances she relates a brief notation of the purpose for the prescription ostensibly written thereon by Wood, e.g., "insomnia," "chronic shoulder disease," "pain," "sleep," "nerves and hypertensive behavior." Additionally, she avers that a pharmacist at the All-Med Pharmacy told her one of the listed patients was diagnosed by Wood as having narcolepsy and had been receiving Ritalin for three to four years. The pharmacist "questioned" the diagnosis and said he believed the patient is addicted to the drug and "may" be abusing it.

The other declaration in support of the Wood subpoena is that of Dr. Schwamb, a board medical consultant. He reviewed the evidence compiled by Sullivan and concludes "because of the definite possibility of excessive prescribing of controlled drug substances . . . in my professional opinion there is a need to obtain the medical records of these patients . . . for further review as to the medical indications for the prescribing of the controlled drug substances and to clarify the medical reasons for the apparent excessive amounts of controlled drug substances being prescribed and to see if appropriate medical conditions or pathology exists to warrant such prescribing and whether good faith physical examinations are being performed initially and in the course of continued prescribing."

Wood opposed enforcement of the subpoena by filing, inter alia, declarations of six local physicians, all of whom asserted that the facts listed in the Sullivan and Schwamb declarations did not "per se" indicate improper prescribing practices in the community. They each could conceive of a variety of circumstances in which the types and amounts of medications prescribed would be appropriate. Each claimed he was an experienced practitioner (from 12 to 26 years experience) and was familiar with the medications in question.

Wood also submitted the declarations of two pharmacists from the All-Med Pharmacy. Both emphatically denied telling Sullivan the patient was addicted to Ritalin or questioning the diagnosis. One pharmacist declared the patient was a regular customer of All-Med and neither "his demeanor or the amount of Ritalin consumed appeared abnormal at any time."

### The Linn Subpoena

The declaration of Harold Keener, a board investigator, states: "an investigation was assigned to me that was initiated by the Sacramento County

Sheriff's Office and the Bureau of Narcotic Enforcement. Allegations are Dr. Linn is prescribing large amounts of schedule II controlled substances to various persons over extended periods of time." Keener interviewed various pharmacists and obtained copies of Linn's Schedule II controlled substances prescriptions. He compiled profiles for 36 patients listing drugs prescribed and durations. Again, some patients' prescriptions contained brief notations of reasons for the prescriptions, e.g., "appetite," "severe pain." Keener interviewed Linn concerning the 36 patients. He obtained "information" (no further specification provided) during the interview concerning six of the patients indicating Linn "may" be guilty of repeated acts of clearly excessive prescribing of drugs as determined by the standard of the local community of doctors. Keener supplied his compiled information on the patients' prescriptions to Dr. Schwamb.

Schwamb's declaration relates the information he received from Keener and avers for each patient some variation of the formula opinion: "The medical record should be procurred [*sic*] to ascertain any medical condition warranting such a long duration of prescribing such large amounts of the controlled drug." Five of the formula opinions contain the allegation that the different drugs prescribed for the patient have contradictory effects.

Linn refused to comply with the subpoena. He opposed judicial enforcement, claiming the amounts and types of prescriptions were not in excess of those dictated by the patients' needs. Linn submitted the declaration of Dr. McKibbin, a surgeon to whom some of the patients had been referred for consultation. McKibbin had retired two years before. He declared he had practiced medicine for 34 years and that, of the hundreds of patients (unidentified) referred to him by Linn, none had been prescribed excessive amounts of medication.

*Discussion*

I.

Petitioners challenge the enforcement of the subpoenas on several grounds. ■ They first argue that the board is denied authority to subpoena the records of patients from a physician's office by Business and Professions Code section 2225.[2] They rely on this provision: "The board's

---

[2]All nondescript statutory references are to the Business and Professions Code. Section 2225 provides in relevant part: "Notwithstanding Section 2263 and any other provision of law making a communication between a physician and surgeon or a podiatrist and his or her patients a privileged communication, such provisions shall not apply to investigations or proceedings conducted under this chapter. Members of the board and the Podiatry Examining Committee, and employees, agents, and representatives of the board shall keep in

authority to examine records of patients *in the office of a physician . . .* is limited to records of patients who have complained to the board about [the physician]." (Italics added.) This proviso is susceptible to two readings: "in the office" either specifies the source of the records to be examined or the place of their examination. The petitioners read it the first way, as a blanket denial of access, absent a patient complaint, to records which are located in the office of the physician. The board reads it the second way, as a prohibition against rummaging through patient records in the office of the physician. This latter reading permits access by subpoena to patient records without patient complaint. We adopt this as the correct reading.

The proviso at issue in section 2225 is conditioned by this sentence: *"Notwithstanding* Section 2263 and *any* other *provision of law making a communication* between a physician . . . and his or her patients a *privileged* communication, such provisions shall not apply to investigations or proceedings conducted under this chapter." *(Ibid.;* italics added.) It stems from a reorganization of the Medical Practice Act (Stats. 1980, ch. 1313, p. 4443 foll.) and is a lineal descendant of a 1965 amendment to former section 2379. (Compare Stats. 1937, ch. 414, p. 1377 with Stats. 1965, ch. 1458, § 7, p. 3415.) Section 2379 then said: "Neither *this section* nor any other provision of law making communication between a physician and surgeon and his patient a privileged communication shall apply to investigations or proceedings conducted under this act." (Stats. 1965, ch. 1458, § 7, p. 3415; italics added.) With this proviso the in-office records were made a privileged communication but subject to "investigations or proceedings conducted under this act." Thus while the board was prevented from rummaging through the records of noncomplaining patients in the office of the physician it was not prohibited from securing them by the appropriate use of an administrative subpoena. The current provisions of section 2225 should be read as continuing these rules. No provision of law relating to the doctor-patient privilege, including section 2225 itself, applies to board investigations or proceedings.

Thus the statutory limitation is addressed solely to the securing of patient records *"in the office* of a physician" absent patient complaint. We are confirmed in this view by our conclusion that the privacy rights of patients can reasonably be accommodated in the calculus of cause sufficient for the issuance of an administrative subpoena. We will discuss that issue after a short detour.

---

confidence during the course of investigations, the names of any patients whose records are reviewed and may not disclose or reveal, except as is necessary during the course of an investigation, such names unless and until proceedings are instituted. The board's authority to examine records of patients in the office of a physician and surgeon or a podiatrist is limited to records of patients who have complained to the board about such licensee."

## II.

The board, somewhat tentatively, calls into question the right of the doctors to assert the privacy interest of their patients who have not consented to disclosure. It suggests that the doctors ought not be allowed to raise the privacy interests of their patients when suspected of conduct detrimental to them. It cites to *Pating* v. *Board of Medical Quality Assurance* (1982) 130 Cal.App.3d 608 [182 Cal.Rptr. 20] where the court, in a passing dictum, characterized as "reasonable" a similar argument. (*Id.,* at p. 621.) We reject this suggestion. It would eviscerate, a priori, whatever right to privacy patients might have. ■ Where the constitutionally protected privacy interests of absent patients are coincident with the interests of the doctor, the doctor must be permitted to speak for them. (See, e.g., *People* v. *Barksdale* (1972) 8 Cal.3d 320, 333 [150 Cal.Rptr. 1, 503 P.2d 257], "A physician has standing to assert his patient's rights where they may not otherwise be established."; see also *Chico Feminist Women's Health Center* v. *Butte Glenn Medical Society* (E.D.Cal. 1983) 557 F.Supp. 1190, 1200.) In the circumstance, as here, where the interests of the physician are also implicated, this is a variety of *first* party standing. (See Monaghan, *Third Party Standing* (1984) 84 Colum.L.Rev. 277, 297-310.) We therefore address the problem of good cause in the light of the patients' privacy interests.

## III.

The petitioners contend it was error to grant the judicial imprimatur to the administrative subpoenas because "good cause" for their issuance was not shown. They derive the requirement of good cause from *Board of Medical Quality Assurance* v. *Gherardini* (1979) 93 Cal.App.3d 669 [156 Cal.Rptr. 55]. They argue that the declarations in support of the subpoenas are premised on opinion without sufficient foundation and on hearsay allegations of the same ilk. The board argues that *Gherardini* only prohibits random or whimsical demands for patient records. It argues that the declarations in support of the subpoenas are adequate. We have concluded that the privacy rights of the absent patients require a more discriminate inquiry than that attempted here, and on that ground conclude that the subpoenas are unsupported by good cause.

The board places its primary reliance upon *Brovelli* v. *Superior Court* (1961) 56 Cal.2d 524 [15 Cal.Rptr. 630, 364 P.2d 462]. *Brovelli* said that "[t]here is no constitutional objection to a system under which the heads of departments of government may compel the production of evidence for purposes of investigation, without instituting formal proceedings against the one from whom the evidence is sought . . . ." (*Id.,* at p. 529.) However,

it cautioned: "Of course, department heads cannot compel the production of evidence in disregard of the privilege against self-incrimination or the constitutional provisions prohibiting unreasonable searches and seizures. . . . Insofar as the prohibition against unreasonable searches and seizures can be said to apply at all it requires only that the inquiry be one which the agency demanding production is authorized to make, that the demand be not too indefinite, and that the information sought be reasonably relevant. (*United States* v. *Morton Salt Co., supra,* 338 U.S. 632, 651-654; *Oklahoma Press Pub. Co.* v. *Walling,* 327 U.S. 186, 202 et seq. [66 S.Ct. 494, 90 L.Ed. 614, 166 A.L.R. 531].)" (*Ibid.*) The board takes this last sentence as its text and argues that it provides a complete definition of good cause in all *administrative* proceedings. We disagree.

*Brovelli* arose from "an investigation commenced by the attorney general to determine whether the Cartwright Act or the Unfair Practices Act was being violated by the concrete block industry . . . ." (*Id.,* at p. 526; see also *Younger* v. *Jensen* (1980) 26 Cal.3d 397 [161 Cal.Rptr. 905, 605 P.2d 813].) The Attorney General had issued administrative subpoenas for the business records of corporations that manufactured and distributed concrete blocks. The Supreme Court upheld contempt citations against the corporation and its officers for their refusal to obey a court order to produce the records. These circumstances circumscribe the *Brovelli* formula. In *Brovelli* the only privacy interest weighing in the balance was that of a business entity. That is the significance of its reliance upon the *Morton Salt Co.* and *Oklahoma Press Pub. Co.* cases, *supra.* Its formula cannot be uncritically extended beyond that context.  ▮  Where the governmental intrusion impinges upon interests in *personal* privacy, whether the intrusion is reasonable must depend upon the nature of that interest and the countervailing state interest in disclosure. That the intrusion is for administrative rather than criminal law enforcement purposes does not as such distinguish the analysis.[3]

---

[3]This is implicit in both lines of reasoning displayed in *People* v. *Hyde* (1974) 12 Cal.3d 158 [115 Cal.Rptr. 358, 524 P.2d 830]. Both the majority and concurring opinions held that the routine antihijack screening and search procedures at airports were reasonable despite the failure to satisfy the criminal law standard of probable cause to believe that each person searched was likely to possess a weapon. The majority relied on the notion that because the search was "administrative" in character such probable cause was not required. However, the opinion did not merely apply the *Brovelli* formulation that is urged upon us by the Attorney General in this case. Rather the *Hyde* court said: "Like all searches subject to the Fourth Amendment, an administrative screening must be measured against the constitutional mandate of reasonableness. In the case of administrative searches, however, 'there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails.' (*Camara* v. *Municipal Court* (1967) *supra,* 387 U.S. 523, 536-537 [18 L.Ed.2d 930, 940].) It is ironic, therefore, that by adopting the administrative search doctrine to evaluate the validity of airport screening procedures we must undertake a similar process of balancing to that which would have followed [had the analysis been along the lines of criminal law precedent]." (*Hyde, supra,* 12 Cal.3d at

■ In any event, the Fourth Amendment and the cognate provisions of the California Constitution, article I, section 13 are now supplemented by the right of privacy guaranteed by article I of the California Constitution. (See *Board of Medical Quality Assurance* v. *Gherardini, supra,* 93 Cal.App.3d 669.) If the *Brovelli* formula could ever have been applied without regard for personal privacy that prospect ended with the adoption of this constitutional directive. The "moving force behind the new constitutional [privacy] provision [is] a . . . focussed [*sic*] privacy concern, relating to the accelerating encroachment on personal freedom and security caused by increased surveillance and data collection activity in contemporary society." (See *White* v. *Davis* (1975) 13 Cal.3d 757, 774 [120 Cal.Rptr. 94, 533 P.2d 222].) "[F]undamental to the privacy of medical information 'is the ability to control [its] circulation[].'" (*Gherardini, supra,* 93 Cal.App.3d 669, 678.) That brings the examination of medical records within the purview of the privacy amendment. The information that may be recorded in a doctor's files is broadranging. The chronology of ailments and treatment is potentially sensitive. Patients may disclose highly personal details of lifestyle and information concerning sources of stress and anxiety. These are matters of great sensitivity going to the core of the concerns for the privacy of information about an individual. The intrusion upon personal privacy when a state agency examines such records is substantial.[4]

■ However, the privacy amendment "does not purport to prohibit all incursion into individual privacy but rather [requires] that any such intervention must be justified by a *compelling interest.*" (*White* v. *Davis, supra,* 13 Cal.3d at p. 775; *Gherardini, supra,* 93 Cal.App.3d at p. 680; italics added.) ■ That there is a strong governmental interest in regulating the prescription of drugs by physicians cannot be gainsaid. (*People* v. *Privitera* (1979) 23 Cal.3d 697, 705 [153 Cal.Rptr. 431, 591 P.2d 919].) The governmental interest in determining if improper prescription of Schedule

p. 166.) The court then proceeded to examine the salient features of the screening procedures and held that because of the compelling governmental interest, the lack of a feasible alternative, and the minor intrusion upon individual privacy the search was reasonable. (*Id.,* at p. 177.)

[4]We are confirmed in this view by the previously discussed prohibition on board examination of patient records on demand that is contained in Business and Professions Code section 2225. Civil Code section 56.10 embodies a similar notion broadly applicable to all licensed health practitioners. Section 56.10, subdivision (c), permits certain disclosures by practitioners without civil liability to the patient for breach of confidence. Section 56.10, subdivision (c)(5), provides: "The information in the possession of any provider of health care may be reviewed by any private or public body responsible for licensing or accrediting the provider of health care. However, no patient identifying medical information may be removed from the premises except as expressly permitted or required elsewhere by law." We note also the legislative finding that the privacy interest of the patient in these records suffices to compel the application of a probable cause standard in a criminal investigation. (See Pen. Code, §§ 1524, 1525; compare with Pen. Code, § 1543 foll.)

II drugs has occurred is manifest. (See *Gherardini, supra,* 93 Cal.App.3d at p. 679.)

However, that only determines the nature of the compelling interest. It does not complete the constitutional equation. An impairment of an interest of constitutional dimension passes constitutional muster only if it is *necessary* to achieve the compelling interest. (See *City of Carmel-By-The-Sea* v. *Young* (1970) 2 Cal.3d 259, 267 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313]; *Arp* v. *Workers' Comp. Appeals Board* (1977) 19 Cal.3d 395, 406 [138 Cal.Rptr. 293, 563 P.2d 849]; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487]; *Sherbert* v. *Verner* (1963) 374 U.S. 398, 407 [10 L.Ed.2d 965, 972, 83 S.Ct. 1790].) That means that the conflict between the competing values must be unavoidable, i.e., that it does not arise from the choice of means by which to secure the compelling interest. It can readily be seen that if the conflict is avoidable but is not avoided the real conflict is not between the compelling interest and the constitutional interest but between the *means* chosen to achieve the compelling interest and the constitutional interest. Thus, a logical corollary of the compelling interest doctrine is the alternatives test. It requires a reordering of the values to be placed on the constitutional scales. If an alternative means of securing the compelling interest can be devised by which to avoid or minimize the conflict between the values protected by the constitution and the values found to be of compelling interest, that must be done. (See generally, Wormuth and Mirkin, *The Doctrine of the Reasonable Alternative* (1964) 9 Utah L.Rev. 254.) This results in a prohibition, among other things, of overbroad means of enforcement. It requires that the state utilize the "least intrusive" means to satisfy its interest. (See *Gherardini, supra,* 93 Cal.App.3d at p. 680.) Mere convenience of means or cost will not satisfy that test for that would make expediency and not the compelling interest the overriding value. (See *Schneider* v. *State* (1939) 308 U.S. 147, 164 [84 L.Ed. 155, 166, 60 S.Ct. 146]; *Castro* v. *State of California* (1970) 2 Cal.3d 223, 241 [85 Cal.Rptr. 20, 466 P.2d 244]; *Fults* v. *Superior Court* (1979) 88 Cal.App.3d 899, 904 [152 Cal.Rptr. 210].)

That brings us to a more precise formulation of the issues. The board has an interest only in the records which are "relevant and material" to the subject under inquiry, the medical propriety of the issuance of the Schedule II prescriptions. (See *Doyle* v. *State Bar of California* (1982) 32 Cal.3d 12, 20 [184 Cal.Rptr. 720, 648 P.2d 942]; *Gherardini, supra,* 93 Cal.App.3d at pp. 680-681.) It has no cognizable interest in viewing the records of patients whose prescriptions were properly issued. Nor can it assert an interest in records which do not bear medically upon the propriety of the prescriptions. It must therefore use methods of discovery which winnow out records which are irrelevant and immaterial to the propriety of the

prescriptions. That means that the scope of the administrative warrants must be carefully tailored to avoid, if possible, the securing of improper records, or other steps must be taken to conceal the identity of the patient. (See *Board of Medical Quality Assurance* v. *Hazel Hawkins Memorial Hospital* (1982) 135 Cal.App.3d 561, 565 [185 Cal.Rptr. 405].)

The first constraint appropriate to accommodate the privacy interest of the patient is that the board must take reasonable steps to notify the patient of its proposed examination. (See *Valley Bank of Nevada* v. *Superior Court* (1975) 15 Cal.3d 652, 658 [125 Cal.Rptr. 553, 542 P.2d 977]; *Doyle, supra,* 32 Cal.3d at p. 21; compare Gov. Code, § 7474.) No reason is advanced why this requirement cannot be met without sacrifice of the board's legitimate interest in disclosure. The doctor is already on notice of the state's investigation. There is no reason to keep the patient in the dark. If the patient has the resources and inclination he or she will be a more satisfactory champion than the physician under investigation.

Second, if the patient does not waive the privacy interest, the board's showing must provide competent evidence that permits the trial court to make an independent finding of good cause. The board must demonstrate that the particular records it seeks are "relevant and material to the board's inquiry" whether the petitioners have improperly prescribed Schedule II drugs. (See *Doyle* v. *State, supra,* 32 Cal.3d at p. 20.) Here the board's showing is lacking in two respects. First, the showing is insufficient to sustain the omnibus demand for the complete medical records of the patients. Second, the showing provides an inadequate foundation upon which the trial court may act other than as a rubber stamp in finding good cause.

The first mentioned defect is the more obvious. No facts are presented in the affidavits that explain why the demands for the "complete" records of the patients are not excessive, i.e., why they do not exceed the scope of concern generated by the audits of petitioners' Schedule II prescriptions. In the context of patient records we see no reason why the board should not be charged with limiting its requests for records to those essential to a focused inquiry. (Compare Gov. Code, § 7470, no disclosure of financial records "unless the financial records are described with particularity and are consistent with the scope and requirements of the investigation giving rise to such request . . . .")

Where the physician is cooperative, a dialogue concerning the board's misgivings and the justification tendered for the prescription seems a sensible measure to limit the degree of intrusion on patient privacy and to set the stage, if necessary, for a particularized demand for records, i.e., one that relates the specific ground of concern to a medical condition of the

patient which is related to that concern. Where the physician does not co-operate, the board has means by which to compel the doctor to justify on medical grounds the prescriptions which are the subject of the inquiry. (See Gov. Code, § 11181, subd. (e).) If the physician tenders a particular justification for suspicious conduct, the scope of the investigation is narrowed to evidence corroborating, penetrating or refuting the claim. In any event, the board must identify the particular records that contain pertinent information and, unless it is obvious to a layperson, show why that information must be obtained to resolve the investigation.

Overbreadth is not the only deficiency of the subpoenas tendered here to the trial court. They also suffer from a lack of sufficient factual justification to permit the trial court to independently assess the substantiality of the likelihood of improper prescription practices. If the trial court is to make the decision of reasonable cause other than as a rubber stamp the root facts upon which an inference of improper prescribing is based must be laid bare. Here we have some facts about the prescriptions and the conclusions of board personnel that they are suspicious but no mediating facts revealing why the conclusion is warranted. The board has made no evidentiary showing of how often physicians similarly-situated to petitioners might prescribe these drugs. Alternatively, the board has made no showing of the likelihood that the prescriptions could have been properly issued, given what is known of the circumstances of issuance. Absent this information the trial court has no means by which to gauge the likelihood that the records sought will reveal physician misconduct. Without this there can be no independent judicial assessment of good cause. The *judicial* function of assessing cause (see 8 Wigmore, Evidence (McNaughton rev. ed. 1961) § 2195) cannot be abdicated by deferring to the bare conclusions of board personnel.

Let a peremptory writ issue directing the respondent court to set aside the judgments (orders for compliance with subpoenas). The alternative writs are discharged.

Sparks, J., and Miller, J.,* concurred.

The petitions of real party in interest for review by the Supreme Court were denied June 20, 1985.

---

*Assigned by the Chairperson of the Judicial Council.