Filed 8/25/21  Kirchmeyer v. Lassen County Adult Services CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| KIMBERLY KIRCHMEYER, as Director, etc., | C087127 |
| Plaintiff and Respondent, | (Super. Ct. No. 34201800229026CUMCGDS) |
| v. | |
| LASSEN COUNTY ADULT SERVICES et al., | |
| Defendants and Respondents; | |
| RICHARD KING, | |
| Intervenor and Appellant. | |

### SUMMARY OF THE APPEAL

Intervenor and Appellant Richard King appeals from a judgement compelling Mountain Valleys Health Centers (Mountain Valleys) and Lassen County Adult Services (LCAS) to comply with investigative subpoenas for King's medical and social services

1

records the Board of Registered Nursing (the Board) served on them. The Board issued the subpoenas in an investigation into alleged unprofessional conduct by Nurse Sharon Hanson. The alleged misconduct included falsifying records of home health visits with King and diagnosing King with a mental disorder, which she is not certified to do. King argues that Welfare and Institutions Code sections 10850 and 14100.2 (unless otherwise indicated, citations to code sections are to the Welfare and Institutions Code) prohibit disclosure of his records, that good cause does not exist to compel the disclosure of the records, and that the subpoenas were unconstitutionally overbroad in violation of his right to privacy as stated in article I, section 1, of the California Constitution. Due to the overlapping nature of King's second and third arguments, we will consider them together, *infra*. Though we interpret sections 10850 and 14100.2 somewhat differently than the trial court, we affirm the judgment.

FACTS AND HISTORY OF THE PROCEEDINGS

Duties of The Board of Registered Nursing

This action was brought by the director of the Department of Consumer Affairs (the Department). Dean Grafilo was the director of the Department at the time the action was filed and Kimberly Kirchmeyer is his successor.

The director of the Department has the power and authority to investigate and prosecute actions concerning matters related to the business activities and subjects under its jurisdiction. (Gov. Code, § 11180.) In connection with an investigation, the director may, among other things, "[i]ssue subpoenas for . . . the production of papers, books, accounts, documents, any writing as defined by Section 250 of the Evidence Code, tangible things, and testimony pertinent or material to any inquiry, investigation, hearing, proceeding, or action conducted in any part of the state." (Gov. Code, § 11181, subd. (e).) The director can delegate investigatory and hearing powers. (Gov. Code, § 11182.)

2

The Board is one of various boards within the Department. (Bus. & Prof. Code, §§ 100, 101, subd. (m), 2701, subd. (a).) The boards, bureaus, and commissions within the Department exist to ensure, "that those private businesses and professions deemed to engage in activities which have potential impact upon the public health, safety, and welfare are adequately regulated in order to protect the people of California." (Bus. & Prof. Code, § 101.6.) To accomplish this purpose, the boards, "establish minimum qualifications and levels of competency and license persons desiring to engage in the occupations they regulate . . . . They provide a means for redress of grievances by investigating allegations of unprofessional conduct, incompetence, fraudulent action, or unlawful activity brought to their attention by members of the public and institute disciplinary action against persons licensed or registered under the provisions of [the Business and Professions C]ode when such action is warranted." (*Ibid.*) The Board is responsible for prosecuting individuals who are guilty of violating the Nursing Practices Act (Bus. & Prof. Code, § 2700 et seq.). (Bus. & Prof. Code, § 2715, subd. (a).)

<u>Administration</u> <u>of</u> <u>In-Home</u> <u>Supportive</u> <u>Services</u> <u>in</u> <u>Lassen</u> <u>County</u>

The In-Home Supportive Services program (IHSS) provides services to aged, blind, or disabled persons who would not be able to remain in their own homes without the services. (§ 12300, subd. (a).) The IHSS is supervised and administered at the state-wide level by the California Department of Social Services (CDSS). (See § 10600.) Counties and their welfare departments then monitor and administer services at the county level. (See § 12300.3, subd. (i) [referencing how counties retain applicant/recipient records]; 12301.1, sub. (b)(1) [discussing how a county welfare department is to assess a recipient's continuing monthly needs].) Some IHSS services are covered by Medi-Cal, as described in article 4, chapter 7, part 3, division 9 of the Welfare and Institutions Code. (See § 14132.95, subds. (a) & (f).) IHSS services covered by

3

Medi-Cal remain "rendered, under the administrative direction of the State Department of Social Services." (§ 14132.95, subd. (f).)

As alleged in the petition in the trial court, LCAS administers the IHSS program in Lassen County.

Circumstances Giving Rise to This Action

King receives IHSS services in Lassen County. Nurse Practitioner Sharon Hanson provided services to King as an employee of Mountain Valleys.

In 2015, 2016, and 2017, Lassen County attempted to discontinue King's IHSS services. Each time, King challenged the County's decision, and the CDSS State Hearings Division heard his appeal. Each time, the hearing officer determined that the county needed to continue providing King IHSS services. Each time, in evaluating King's need for services, the hearing officer considered an IHSS Program Health Care Certification form SOC 873 filled out by and/or letters written by Hanson. The CDSS decisions observed it was Hanson's opinion King needed IHSS services to safely remain in his home, and that he is unable to perform domestic and related services. In a note dated November 7, 2016, Hanson admitted that, on a form SOC 873 she filled out, she incorrectly indicated she had last seen King on July 18, 2016, when, in fact, she had last seen King in her clinic on a different date, August 10, 2016.

On October 20, 2016--a little over one month after King challenged the county's 2016 decision to discontinue his IHSS services, and before the CDSS hearing date to resolve that challenge--the Board received a complaint from LCAS, claiming that Hanson had falsified home health visits with King and diagnosed him with a mental disorder while working for Mountain Valleys. In August 2017, Kristy Whitmire, a special investigator for the Board, interviewed the program manager for LCAS. The program manager reported Hanson had sent a letter to Lassen County IHSS claiming her last visit with King had been on July 18, 2016, but that Mountain Valleys's records showed

4

Hanson's most recent visit with King had been on June 12, 2014, and Hanson had visited King twice before, on October 17, 2011, and April 4, 2013.

On October 11, 2017, the Board sent notices to King telling him the Board was subpoenaing his records from LCAS and Mountain Valleys. Copies of the subpoenas were attached to the notices. The notices told King to raise any objections to the subpoenas before October 26, 2017, in order to prevent his records from being released before he could state objections to the subpoenas. The subpoenas were signed by a Board employee to whom Grafilo had delegated investigatory authority.

The Board served the subpoenas on LCAS and Mountain Valleys on October 11, 2017.

In general, the subpoena to LCAS sought "[f]acility investigation records, for the time period of 04/10/2003 through 04/18/17, pertaining to Richard King." The 2003 beginning date is consistent with a statement in the 2015 CDSS decision that, "[a]ccording to [King's] wife, [King] has received IHSS intermittently from the county since 2003." The subpoena specified that the records should include, a timeline of events; LCAS Physician's Evaluations dated April 21, 2003; letters, notes, form SOC 873s, and records of encounter visits mentioned in the CDSS decisions to reinstate King's services in addition to some records of encounter visits from 2017, an "Chandler/LCSA Letter dated 07/19/16," and IHSS social worker notes from around the time the County notified King it planned to discontinue his services in 2016 to shortly after the CDSS State Hearings Division issued a decision requiring the county to continue those services.

In general, the subpoena to Mountain Valleys sought, "[u]nredacted medical records, for the time period of 04/10/2003 through 04/18/17, for Richard King." It specified that the records produced should include, all physicians orders, all nursing notes and assessments, all LCAS physician's evaluations for IHSS, all encounter visits, all SOC 873 forms, and a list of letters and notes prepared by Hanson that were mentioned in the CDSS decisions reinstating King's IHSS services.

5

Whitmire signed declarations in support of the subpoenas, in which she stated the Board needed the requested documents "to offer as evidence to investigate the allegations that Sharon Hanson has violated Business and Professions Code section 2761[, subdivision] (a) and/or 2671[, subdivision ](a)(1)."

According to the petition filed in the trial court, Mountain Valleys produced records to the Board on October 19, 2017, and LCAS produced records on October 23, 2017.  In a letter to Whitmire dated October 24, 2017, King's attorney said King objected to the production of his records.  The petition alleges the Board has retained the records under seal.

Proceedings in the Trial Court

The director of the Department filed a petition for an order compelling compliance with the subpoenas on March 14, 2018.  The petition named LCAS and Mountain Valleys as respondents.  King successfully sought to intervene in the action.  In his opposition to the petition, King submitted the November 7, 2016, letter from Hanson in which she indicated she had not visited King on July 18, 2016, but on August 10, 2016, and the CDSS decisions.

The trial court granted the Department's petition and ordered Mountain Valleys and LCAS to comply with the subpoenas.  Though the court did agree that section 14100.2 could apply to protect King's records, the court disagreed with him regarding the applicability and interpretation of section 10850, subdivision (a), and found section 10850 allowed for the release of the records sought by the Department.  The court also found that the Department showed a compelling interest in disclosure of the records that outweighed King's right to privacy in those records.

6

I

*The Records Are Subject to Disclosure By Statute*

King argues that the trial court erred in finding (1) that his records were not protected under section 10850; and (2) that even though the confidentiality provisions of section 14100.2 would protect his records, the records were still subject to disclosure because of the confidentiality exceptions contained in section 10850.  We agree with the trial court that the records sought were not protected under section 10850 due to the exceptions to confidentiality protections contained in the statute, but we disagree with the trial court's conclusion that the records were not subject to disclosure under section 14100.2.  As such, we see no conflict in allowing for the disclosure of records under section 10850 and affirm the trial court's ruling.

A.  Standard of Review

"The interpretation of a statute presents a question of law that this court reviews de novo."  (*Smith v. Loanme, Inc.* (2021) 11 Cal.5th 183, 190.)

"Deference is given to the factual findings of trial courts because those courts generally are in a better position to evaluate and weigh the evidence.  (*People v. Louis* [(1986)] 42 Cal.3d [969,] 986.)  The Courts of Appeal, on the other hand, are in a better position to resolve legal issues, because ' "appellate judges are freer to concentrate on legal questions" ' and the judgment of three or more judges is brought to bear in every case.  (*Ibid.*, quoting *U.S. v. McConney*[ (1984)] 728 F.2d [1195], 1201.)  Furthermore, factual determinations generally are of concern only to the litigants, whereas appellate decisions provide controlling precedent for future cases.  ' "From the standpoint of sound judicial administration, therefore, it makes sense to concentrate appellate resources on ensuring the correctness of determinations of law." ' (*People v. Louis*, at p. 986, quoting

7

*U.S. v. McConney*, *supra*, 728 F.2d at p. 1201.)" (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 385.)

B. Section 10850 Allows for Disclosure of Non-Medi-Cal Records

Section 10850, subdivision (a), limits the disclosure of social service records concerning recipients of social services as follows: "[e]xcept as otherwise provided in this section, all applications and records concerning any individual made or kept by a public officer or agency in connection with the administration of any provision of this code relating to any form of public social services for which grants-in-aid are received by this state from the United States government shall be confidential, and shall not be open to examination for any purpose not directly connected with the administration of that program, or any investigation, prosecution, or criminal or civil proceeding conducted in connection with the administration of that program." These disclosure limits, exceptions, and protections do not apply to records kept as part of the provision of Medi-Cal services: "[p]ublic social services, as defined in Section 10051, includes publicly funded health care services administered or supervised by the department or the State Department of Health Care Services, *except that, as used in this section, it does not include the Medi-Cal program. This subdivision does not affect or alter the exclusions contained in subdivision (i) or the confidentiality provisions contained in Section 14100.2.*" (§ 10850, subd. (j)(1), italics added.) Thus, to the extent the services King received were Medi-Cal services and, therefore, covered by the confidentiality provisions and exceptions contained in section 14100.2, section 10850 does not apply to the release *or* protection of those records.

To the extent the services provided to King were not provided under the Medi-Cal umbrella, we agree with the trial court that section 10850 permits their disclosure in this instance. An investigation into whether a nurse acted unprofessionally in providing opinions relied upon by CDSS to determine the IHSS eligibility of an IHSS services

8

recipient is directly connected to the administration of the IHSS program. This investigation arose because LCAS, the administrator of the IHSS program in Lassen County, became concerned that Hanson was falsifying records of visits and improperly diagnosed King, and CDSS relied on those records and that diagnosis to justify providing King IHSS services. As an administrator of IHSS, LCAS has an interest in making sure its service providers behave honestly and professionally, and in a manner that does not result in the misallocation of funds, when providing opinions to LCAS and CDSS, the state-wide administrator for IHSS services. Here, concerns about Hanson's unprofessional conduct arose as a result of--i.e., in connection with--the administration of the IHSS program. LCAS, the local administrator, then contacted the Board, which is uniquely qualified to both (1) determine whether Hanson's actions deviated from professional standards, and, (2) if Hanson is found to have acted unprofessionally, to impose disciplinary measures that will dissuade her from committing further unprofessional conduct in providing information used to determine patient eligibility for IHSS.

Citing section 12305.82, King implies that the Board's investigation cannot be the type of proceeding in which his records may be disclosed under section 10850, because the Board is not pursuing allegations that explicitly state Hanson committed fraud. This argument is not persuasive.

Section 12305.82, specifically provides a mechanism for the State Department of Health Care Services and local IHSS administrators to "investigate fraud in the provision or receipt of in-home supportive services," and to "work together as appropriate to coordinate activities to detect and prevent fraud by in-home supportive services providers and recipients . . . , to take appropriate administrative action relating to suspected fraud in the provision or receipt of in-home supportive services, and to refer suspected criminal offenses to appropriate law enforcement agencies for prosecution." (§ 12305.82, subd. (a).) The protocols established for these investigations allow, "[t]he State Department of

9

Health Care Services, the department, and the county [to] share data with each other as necessary to prevent fraud and investigate suspected fraud pursuant to this section," and requires that "[t]he information shall only be used for purposes of preventing and investigating suspected fraud in the In-Home Supportive Services program, and shall otherwise remain confidential." (§ 12305.82, subd. (b).)

This statute specifically applies to fraud investigations by IHSS administrators and the information shared between state and local IHSS administration agencies and the Department of Health Care Services in those investigations. The statute does not say its protocols apply to information shared in investigating all matters connected to the administration of the IHSS program.

Similarly, section 10850, which does govern information-sharing in investigations related to the administration of non-Medi-Cal IHSS services, neither indicates which state agencies may or may not be involved in conducting an investigation connected to the administration of a social service program administration, nor requires the investigation be specifically aimed at preventing fraud before information can be shared among entities.

Though it is certainly possible that an investigation into an administrative matter may involve allegations of fraud, there is nothing in section 10850 to suggest an investigation into unprofessional conduct tantamount to negligence cannot fall within the confidentiality exception's rubric. Indeed, to fully prevent the misuse of public funds and protect service recipients from the harm of having their needs misidentified, there must be in place mechanisms that allow for the thorough investigation of negligent administrative practices, even if those practices do not stem from the fraudulent intent of the administrators or those who act as their advisors in determining program eligibility.

In making his argument regarding section 12305.82, King suggests we place a limit on the confidentiality exception in section 10850 that the Legislature did not

10

provide.  We decline to do that.  (*Kaanaana v. Barrett Business Services, Inc.* (2021) 11 Cal.5th 158, 171 ["It is not for us to insert a limitation the Legislature excluded"].)

We are also not persuaded by King's argument we should narrowly read the confidentiality exception in section 10850, subdivision (a), to exclude investigations by the Board, because cases that have allowed for the disclosure of confidential records under section 10850 primarily involve the disclosure of records to employees or agents of welfare programs.  He says the central questions in these cases were not focused on the identity of the investigating agencies.  He relies on the following decisions:

In *County of Nevada v. Kinicki* (1980) 106 Cal.App.3d 357, 361 (*County of Nevada*), a plaintiff seeking to protect his records conceded that the civil proceeding he was involved in was, "directly connected with the administration of the program," and that, "consequently, section 10850 does not prohibit production of the welfare records requested in defendant's subpoena duces tecum."  Thus, when the confidentiality exception of section 10850 applies was not at issue at all.

In *Haskins v. San Diego County Department of Public Welfare* (1980) 100 Cal.App.3d 961, 964 (*Haskins*), the issue was whether the county public welfare department had acted negligently, in violation of a duty to keep welfare files confidential under section 10850, when it allowed an employee who was the ex-wife of a welfare recipient's husband to access the recipient's files, leading to a fraud investigation against the recipient.  The ability of other state agencies to access records under the confidentiality exception in section 10850 was not at issue.

In *Rivera v. Los Angeles Civil Service Commission* (1979) 87 Cal.App.3d 1001, 1003-1005 (*Rivera*), the court considered whether, in an action concerning the termination of a Los Angeles County Department of Public Social Services (DPSS) employee based on the allegation that she had accepted overpayments as a recipient of funds from DPSS, "applications and records concerning [the employee] as a client of DPSS were confidential and," therefore under section 10850, "should not be examined in

11

the course of the civil service commission hearing" considering the propriety of her termination.

*In re Jeannie Q.* (1973) 32 Cal.App.3d 288, 292, 305, the court considered whether, in a dependency hearing, testimony by (1) a protective services worker for Department of Public and Social Services; and (2) a doctor who provided the protective services worker, in the administration of her job, information about his examination of children, would be privileged under section 10850. Concluding that, "[t]he physical welfare of the children is of prime interest to the state and to the DPSS in its administration of the program," the court found the information was not protected by section 10850. (*Id.* at p. 305.)

In none of these cases was the court asked to determine if information that would otherwise be protected by section 10850 can be shared, under the exceptions to confidentiality stated in the section, with an agency that is not a social services agency administering the program--i.e., CDSS or a local service administrator--operating under a general statutory mandate that includes investigating matters not directly related to the administration of social services. " ' " '[I]t is axiomatic that cases are not authority for propositions not considered.' " ' (*McWilliams v. City of Long Beach* (2013) 56 Cal.4th 613, 626 [][.)]" (*Riverside County Sheriff's Dept. v. Stiglitz* (2014) 60 Cal.4th 624, 641.) Hence, these cases do not provide any authority for King's position.

We find that the Board's investigation is directly related to how Hanson performed her duties in evaluating a patient's need for IHSS services, an evaluation that played a pivotal role in CDSS determining continued services must be provided to that patient.

C. Section 14100.2 Allows Disclosure of Medi-Cal Records

As indicated in the beginning of section I., B., *ante*, to the extent King's records are for Medi-Cal services, we find that 10850 does not govern whether the records can be

12

disclosed in this matter.  (§ 10850, subd. (j)(1).)  Section 14100.2 governs.  We hold section 14100.2, by its plain terms, permits the release of King's records to the Board.

Section 14100.2, subdivision (a), provides, as relevant here, that "all types of information, whether written or oral, concerning a person, made or kept by any public officer or agency in connection with the administration of any provision of *this chapter*"--which is chapter 7, part 3, division 9 of the Welfare and Institutions Code, the same chapter of the Welfare and Institutions Code that places certain IHSS services under the Medi-Cal umbrella (see §  14132.95, subds. (a) & (f))--"for which a grant-in-aid is received by this state from the United States government pursuant to Title XIX of the Social Security Act shall be confidential, and shall not be open to examination other than for purposes directly connected with the administration of the Medi-Cal program." (Italics added.)

Section 14100.2, subdivision (c), clarifies what it means for something to be "directly connected with the administration of the Medi-Cal program."  It says the phrase "encompass[es] those administrative activities and responsibilities in which the department and its agents are required to engage to insure effective program operations. These activities include, but are not limited to: establishing eligibility and methods of reimbursement; determining the amount of medical assistance; providing services for recipients; conducting or assisting an investigation, prosecution, or civil or criminal proceeding related to the administration of the Medi-Cal program; and conducting or assisting a legislative investigation or audit related to the administration of the Medi-Cal program."  (§ 14100.2, subd. (c).)  Thus, cooperating and providing critical records in an investigation related to a nurse's activities in "establishing eligibility . . . ; determining the amount of medical assistance; [and] providing services for recipients," is "directly connected with the administration of the Medi-Cal program."

Here, based on a complaint by the local IHSS administrator, the Board is investigating actions taken by Hanson when she performed tasks that contributed to

13

CDSS's determination of King's need for Medi-Cal-covered IHSS services. Based on the plain words of the statute, Hanson's activities, LCAS's role in ensuring it can rely on the information it and CDSS obtain in determining an individual's need for IHSS services, and the Board's investigation of the activities stemming from a complaint by LCAS regarding the reliability of that information are "directly connected with the administration of the Medi-Cal program."

II

*The Subpoenas Were Not Unconstitutional*

The right to privacy set forth in article I, section 1 of the California Constitution extends to an individual's medical records. (*Grafilo v. Cohanshohet* (2019) 32 Cal.App.5th 428, 436.)

King raises two arguments regarding the propriety of the subpoenas in light of this right. First, King argues that the trial erred when it found that the Board showed good cause to allow it to subpoena King's records, thereby invading his privacy rights. Second, King argues that the scope of the records sought in the subpoenas is overbroad in light of his privacy interests and the specific nature of Hanson's alleged misconduct. We disagree with both arguments.

A.  Applicable Law in Evaluating Violation of Privacy Claims

"Article I, section 1 of the California Constitution guarantees certain inalienable rights. 'Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.' (Cal. Const., art. I, § 1.)" (*Lewis v. Superior Court* (2017) 3 Cal.5th 561, 569.)

"In *Hill v. National Collegiate Athletic Assn.* (1994) 7 Cal.4th 1, 35 [], the California Supreme Court established a framework for evaluating potential invasions of privacy. The party asserting a privacy right must establish a legally protected privacy interest, an objectively reasonable expectation of privacy in the given circumstances, and

14

a threatened intrusion that is serious. *(Id.* at pp. 35–37.) The party seeking information may raise in response whatever legitimate and important countervailing interests disclosure serves, while the party seeking protection may identify feasible alternatives that serve the same interests or protective measures that would diminish the loss of privacy. A court must then balance these competing considerations. *(Id.* at pp. 37–40.) ¶ Additionally, good cause is required to be shown when the state seeks to invade an individual's privacy rights through an administrative subpoena seeking his or her medical records. ([*Board of Medical Quality Assurance v.] Gherardini*[(1979)] 93 Cal.App.3d [669,] 681 [(*Gherardini*)]; *Wood v. Superior Court* (1985) 166 Cal.App.3d 1138, 1141–1143 [] (*Wood*).) Good cause ' "calls for a factual exposition of a reasonable ground for the sought order." ' (*Gherardini*, *supra*, at p. 681, quoting *Waters v. Superior Court* (1962) 58 Cal.2d 885, 893 [].)" (*Grafilo v. Cohanshohet, supra,* 32 Cal.App.5th at pp. 436-437.)

On appeal, "[t]he question of whether a subpoena meets the constitutional standards for enforcement is a question of law to be reviewed de novo. (*Fett v. Medical Bd. of California* (2016) 245 Cal.App.4th 211, 216 [] (*Fett*); *Millan v. Restaurant Enterprises Group, Inc.* (1993) 14 Cal.App.4th 477, 485 [].) The superior court's factual findings regarding whether the Board established good cause to intrude on the patients' privacy rights are reviewed under the substantial evidence standard. (*Fett*, *supra*, 245 Cal.App.4th at p. 216.)" (*Grafilo v. Cohanshohet, supra,* 32 Cal.App.5th at p. 436 [].)

Because our good cause analysis informs our analysis regarding the alleged overbreadth of the subpoenas, we begin with that.

15

B.  Substantial Evidence Supports the Finding that Good Cause Exists to Compel the Production of King's Records

When seeking access to private medical records, administrative agencies, "must demonstrate through competent evidence that the particular records it seeks are relevant and material to its inquiry sufficient for a trial court to independently make a finding of good cause to order the materials disclosed."  (*Bearman v. Superior Court* (2004) 117 Cal.App.4th 463, 469 (*Bearman*).)

The trial court found that the Board showed a "compelling interest" in the production of King's records, observing "it was Hanson['s] submission of form SOC 873 regarding King's health status that prompted the complaint and subsequent investigation."  Additionally, the trial court agreed with the Board's assessment that Hanson's professional duties require accuracy and honesty in reporting medical information to IHSS program administrators concerning a recipient's health care status and needs.  We find that substantial evidence supports the trial court's conclusion.

Here, the county administrator of the IHSS program informed the Board that Hanson sent a letter to the county IHSS program stating she had visited King on July 18, 2016, when, in fact, Mountain Valleys's records indicated Hanson had last visited with King on June 12, 2014.  Though King implies in his reply that this error should not be seen as sufficient evidence of good cause because Hanson later, "corrected" her mistake, based on this record, it appears that any "correction" was made on November 7, 2016, *after* LCAS made its October 20, 2016, complaint to the Board.  As such, whether Hanson would have corrected the record on her own accord remains unknown.  Additionally, in issuing that correction, Hanson stated she actually visited with King on August 10, 2016, a visitation date also not recorded in Mountain Valleys records referred to in Whitmire's good cause declaration.  Also, LCAS reported that based on information available to it, it believed Hanson had diagnosed King with a mental disorder, a diagnosis

16

she lacks the certification to make. (Bus. & Prof. Code, § 2052, subd. (a).) Hanson's reporting of King's condition played a vital role in CDSS's determination that King needed IHSS services. Hence, substantial evidence supports the trial court's determination that there is a compelling interest that justifies the disclosure of King's records in an investigation into Hanson's conduct. Her alleged unprofessional conduct impacts the ability of the county and state to effectively administer IHSS services, and that alleged conduct occurred in her treatment and evaluation of King.

In an effort to convince this court that the trial court's decision here was not based on substantial evidence, King relies heavily on *Bearman, supra,* 117 Cal.App.4th 463 and *Wood, supra,* 166 Cal.App.3d 1138 in which appellate courts found there was not good cause to compel disclosure of records.

These cases are distinguishable. To begin with, in *Bearman, supra,* 117 Cal.App.4th at pages 467-468, the Medical Board sought a patient's medical records in an investigation it initiated after a park ranger alerted the Board that he felt a doctor, who had provided his patient with a letter certifying the patient's medical use of marijuana, had "possibly violat[ed] the law and medical ethics by exceeding his scope of practice." Additionally, the court concluded that one of the grounds the Medical Board provided as "good cause" for compelling the patient's records was based on a misreading of the letter the doctor had written for the patient. (*Id.* at pp. 471-472.)

In this action, the complaint at issue was made by LCAS, which has a particular interest in ensuring the reliability of records submitted by individuals making recommendations about the scope of IHSS services to be provided to Lassen County IHSS beneficiaries. Additionally, there is no dispute that Hanson did, in fact, indicate on a form that she visited with King on a date she did not actually visit him. LCAS and the Board are not misreading the form.

Additionally, in *Wood* and *Bearman* the administrative agency sought patient records based on declarations containing allegations that were far less definitive than the

17

declarations here in terms of identifying suspected wrongdoing that gave rise to the investigations.

In *Wood, supra,* 166 Cal.App.3d at pages 1141-1142, the Medical Board submitted one declaration in support of a subpoena indicating it was an investigator's "opinion" that a doctor was prescribing drugs in "larger quantities of these drugs and for longer periods than usual for a general practitioner in the community," and a second declaration stating there was a definite "possibility" the doctor was prescribing excessive quantities of controlled substances. A declaration in support of another subpoena indicated a doctor, "*may*" be guilty of repeated acts of excessive prescriptions. (*Id.* at p. 1143, italics added.) In *Bearman*, *supra*, 117 Cal.App.4th at page 469, a declaration in support of the subpoena indicated that the physician, "*may* be violating the law and the standard of care if he is recommending the medical use of marijuana." (Italics added.)

Thus, in *Bearman* and *Wood*, the administrative agency failed to indicate that even if the doctors under investigation had certified their patient's use of medical marijuana or prescribed a certain level of prescription drugs, that certification and prescription, respectively, would definitively fall outside the standard of care. Here, it is undisputed that Hanson submitted a form that indicated she had visited with King on a date she had not visited with him. Likewise, LCAS has alleged Hanson diagnosed King with a medical condition, something nurses are not authorized to do. (See Bus. & Prof., § 2052, subd. (a).)

C. The Subpoenas Are Not Overbroad

"[I]information demanded by an administrative subpoena . . . must be ' "relevant and material" ' to the investigation being conducted. (*Wood*, *supra*, 166 Cal.App.3d at p. 1149 ['The board must demonstrate that the particular records it seeks are "relevant and material to the board's inquiry" whether the petitioners have improperly prescribed

18

Schedule II drugs']; accord, *Bearman[, supra,]* 117 Cal.App.4th [at p.] 469 [].)" (*Cross v. Superior Court* (2017) 11 Cal.App.5th 305, 329.)

Here, the records sought are relevant and material to the Board's investigation. The Board is investigating whether Hanson has engaged in unprofessional conduct. The Board's belief that Hanson has engaged in unprofessional conduct is firmly rooted in information it has obtained regarding her treatment of King: the Board has been told Hanson has submitted at least one report indicating she met with King, when she, in fact, had not met with him; and the Board has been advised that Hanson may have diagnosed King with a mental condition. As discussed above, Hanson's assessment of King's needs has played a key part in his ability to obtain IHSS services, and King's wife indicated he has received IHSS services from the county since 2003. The records sought are relevant and material to ascertaining (a) if Hanson's reports of treatment and interactions with King as made to the LCAS and CDSS are supported by records kept by her employer, Mountain Valleys, and (b) if Hanson's reports of King's medical conditions are consistent with diagnoses made by certified doctors since King first became eligible for IHSS services, contrary to conclusions reached by certified doctors, based purely on her own assessments, and/or based on unverified representations made by King.

The subpoenas focused on the timeframe in which King has participated in the IHSS program, and allegations of suspected unprofessional conduct by Hanson stem from her treatment and evaluation of King as a participant in that program. The subpoenas were not overboard.

19

## DISPOSITION

We affirm the trial court's ruling.  Each side is to bear their own costs on appeal. (Cal. Rules of Court, rule 8.278.)

_____

HULL, Acting P. J.

We concur:

_____

MURRAY, J.

_____

KRAUSE, J.